UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROGER BATTACHARIA,

                        Plaintiff,

    -against-

PERNOD RICARD USA, LLC,

                        Defendant.

No. 13-cv-7222 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Roger Battacharia asserts claims against his former employer, Pernod Ricard USA, LLC, ("Pernod" or the "Defendant"), arising out of the termination of his employment on June 3, 2013. Plaintiff alleges that Defendant discriminated against him on the basis of his race, color, and/or national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq.* ("NYCHRL"). Plaintiff further alleges that Defendant retaliated against him in violation of Title VII, NYSHRL, and NYCHRL, and unlawfully denied him severance pay in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").

Before the Court is Defendant's motion for summary judgment. For the following reasons, Defendant's motion is GRANTED.

## BACKGROUND

Although Plaintiff denies the veracity of nearly all of Defendant's Local Civil Rule 56.1 statements and offers additional material facts to which there are purportedly genuine issues for trial, the Court finds that many of Defendant's statements are not genuinely disputed by Plaintiff.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____ 8|13|2015
DATE FILED:

In many cases, Plaintiff merely offers additional facts that are not inconsistent with Defendant's statements of fact.  Accordingly, the Court treats the factual assertions in Defendant's Local Civil Rule 56.1 statement admitted unless directly controverted by Plaintiff's statements or other admissible evidence identified by Plaintiff.  The following facts, unless otherwise noted, are based on the undisputed facts in this matter or support Plaintiff's version of events.

Plaintiff, an Indian-American, was hired by Defendant in or about October 2007 as a Director of Business Analysis and Insights in Pernod's finance department.  (Compl. ¶ 11; Affidavit of Roger Battacharia in Opposition to Defendant's Rule 56(a) Motion for Summary Judgment ("Battacharia Aff.") ¶ 8.)  At some point after joining Pernod, and for at least two years prior to August 2012, Plaintiff sought a transfer to Pernod's marketing department.  (Affirmation of Marc O. Sheridan, Esq. in Opposition to Defendant's Rule 56(a) Motion for Summary Judgment ("Sheridan Aff.") at Ex. 1, 133-135.)  Although Plaintiff desired a "brand director level" position in the marketing department for a number of years, he contends that his applications were repeatedly rebuffed and the positions were given to less qualified Caucasian employees.  (Pl.'s Opp. at 3.)  In July 2012, Plaintiff applied for the position of Marketing Director for Tequila Avion in Pernod's marking department and was hired in August 2012.  (Sheridan Aff." at Ex. 1, 134-135.)

I.    **Anonymous Emails and Pernod's Subsequent Investigation**

In May 2013, Pernod's Chief Executive Officer, Brian Fry, and Senior Vice President of Spirits Sales, Martin Crane, received emails from Ashish Ambani, Vice President of Marketing Finance and Brand Analysis at Pernod.  (Plaintiff Roger Battacharia's Local Civil Rule 56.1 Counter-Statement of Material Facts ("Pl.'s 56.1") at ¶¶ 1-2, 4.)  Fry and Crane informed John Nicodemo, Pernod's Chief Financial Officer and Ambani's supervisor, of the emails, which

criticized the leadership and direction of the company, and requested certain organizational changes at Pernod. (*Id.* ¶¶ 2, 5-6.) Nicodemo was not copied on the emails to Fry and Crane, and was upset that Ambani intentionally circumvented him by writing directly to Pernod's executive leadership. (*Id.* ¶ 6.) After reviewing the emails, Nicodemo forwarded them to senior members of Pernod's Human Resources department and informed them of his intention to speak with Ambani. (*Id.* ¶ 7.)

On May 16, 2013, Nicodemo and Ambani met to discuss the emails. (*Id.* ¶ 8.) Ambani denied sending the emails. (*Id.*) Though Nicodemo recalls that Ambani also stated that the email addresses from which the emails were sent were not his, (Defendant Pernod Ricard USA, LLC's Local Civil Rule 56.1 Statement of Material Facts ("Def.'s 56.1") ¶ 8), Ambani testified that Nicodemo never asked about the email addresses during the meeting. (Pl.'s 56.1 ¶ 8.) After discussing the emails, Ambani told Nicodemo that he had also received three "phony" emails. (*Id.* ¶ 9.) Ambani did not report the emails to the company and deleted them because they made "very personal references . . . [and were] very depressing, inappropriate, [and] racist, and [Ambani] didn't want to have any source to go back to those emails." (*Id.* ¶ 9; Sheridan Aff., Ex. 4 at 76.) Ambani also stated that he deleted the emails because he was embarrassed and wanted to ignore them. (Pl.'s 56.1 ¶ 9.) Ambani then told Nicodemo that he thought Plaintiff was responsible for sending the emails because Plaintiff would have had the most to gain if Ambani was fired. (*Id.* ¶ 10.) Nicodemo demanded that Ambani send him the three purportedly offensive emails that Ambani claimed to have received from an anonymous source. (*Id.* ¶¶ 11-12.) Ambani contacted Pernod's I.T. department, which was able to help him restore the deleted emails, and he forwarded them to Nicodemo. (*Id.* ¶¶ 12-15.)

Ambani and Nicodemo met again that evening to discuss the emails. (*Id.* ¶ 16.) During the meeting, Nicodemo stated that based on his reading of the emails, it appeared that the writer had insight into Indian culture and nomenclature. (Sheridan Aff., Ex. 6 at 78-82.) After asking Ambani if he knew of anyone "out to get him," Ambani told Nicodemo that Plaintiff was Indian. (Pl.'s 56.1 ¶ 16; Sheridan Aff., Ex. 6 at 79:15-17.) Plaintiff never told Ambani that he wanted his position, and it was well-known that Plaintiff aspired to secure a brand director position in Pernod's marketing department. (Pl.'s 56.1 ¶ 10.)

Following this conversation, Nicodemo initiated an investigation into the subject emails, and enlisted the help of Michele Cubbon, a Senior Counsel and Ethics Officer at Pernod, as well as Emmanuel Cargill and Bennett Schuberg, senior members of Pernod's Human Resources department. (*Id.* ¶ 17.) On May 20, 2013, Cubbon and Schuberg met with Ambani to discuss the emails Ambani had received. (*Id.* ¶ 19.) Ambani explained that the term "ABCD" or "American Born Confused Desi" was derogatory and referred to someone of South Asian heritage who was born or nationalized in the United States. (*Id.* ¶ 20.) He noted that the term "American Boy Confused Desi" was not the proper use of the term and the "B" usually stands for "Born." (Sheridan Aff., Ex. 4 at 104:2-19.) He also noted that he found the statement about "having to return to your Desh[,]" which means "country" in Hindi, to be racist. (*Id.* at 102:21-23, 105:22-106:3.) Although Ambani did not recognize the term "Vaisya" when asked during his deposition, (*id.* at 102:11-15), Cubbon and Schuberg testified that Ambani advised them the term referred to a lower caste in Indian society and that the writer was signifying Ambani was not worthy of his level in society. (Def.'s 56.1 ¶ 23.) Ambani also stated that the email address used to send the three anonymous emails – sindhirdumb@yahoo.com – referred to the Sindhi community in India and that most members have last names that end in "a" or "i." (Pl.'s 56.1 ¶

21.)  The emails contained a number of other statements and potentially derogatory comments.

(*Id.* ¶¶ 21-24.)  Ambani also explained that he believed Plaintiff was responsible for sending the

emails.  (*Id.* ¶ 25.)

At some point after the meeting, Schuberg and Cubbon conducted research to confirm the

potentially derogatory nature of the terms used in the emails.  (*Id.* ¶ 26.)  Cubbon also requested

access to Plaintiff's email account, as well as searches of Kate Pomeroy's email, an individual at

Pernod who Ambani identified as potentially having "an axe to grind with him."  (*Id.* ¶¶ 25, 27.)

Pernod's I.T. department searched Pomeroy's emails for the email addresses used to send the

relevant emails, but returned no hits.  (*Id.* ¶ 27; Sheridan Aff., Ex. 14 at 137-138.)  Cubbon

further requested that I.T. attempt to identify the Internet Protocol or I.P. addresses from which

the emails originated.  (Pl.'s 56.1 ¶ 28.)  I.T. was able to identify the I.P. address for four of the

five emails as "67.87.228.31," a Cablevision I.P. address, but I.T. could not obtain further

information without a court order.  (*Id.* ¶ 29; Affirmation of Jonthan[sic] M. Kozak, Esq., in

Support of Pernod Richard USA, LLC's Motion for Summary Judgment ("Kozak Aff."), Ex. W.)

In an effort to determine the origin of the I.P. address, Cubbon engaged a forensic I.T.

expert, IDT911 ("IDT"), to conduct an investigation.  (*Id.* ¶ 30.)  IDT reviewed Pernod's

electronic systems, including access records to its Virtual Private Network or VPN, during the

time periods when the anonymous emails were sent.  (*Id.* ¶ 31.)  On May 29, 2013, IDT

submitted its initial report, which found that Plaintiff had "authenticated to the VPN" on May 21,

2013 with the same I.P. address as the three emails sent to Ambani and the one email sent to Fry.

(*Id.* ¶ 32; Sheridan Aff., Ex. 25 at 998.)  The report also noted that Plaintiff had used the same

I.P. address from at least April 29, 2013 through May 21, 2013.  (*Id.*)  Plaintiff admits that he

had been working from home in the early morning of May 21, 2013.  (*Id.* ¶¶ 32, 34.)

On May 30, 2013, Cubbon and Schuberg met with Plaintiff to discuss the emails.  (*Id.* ¶¶ 36-37.)  Plaintiff denied that he authored the emails and explained that he was not even aware of the subject matter contained in the emails.  (*Id.* ¶ 37.)  Plaintiff was purportedly not told of the pending investigation, (*id.*), but Cubbon has testified to the contrary.  (Sheridan Aff., Ex. 14 at 175:17-20.)  In response to questions from Cubbon and Schuberg, Plaintiff also admitted to working from home on May 21, 2013.  (*Id.* ¶ 38.)  Plaintiff's home Internet provider was Cablevision.  (*Id.* ¶ 41.)

Plaintiff was then suspended pending further investigation and asked to provide his home I.P. address to Cubbon.  (*Id.* ¶¶ 40-41.)  Plaintiff was unable to obtain his I.P. address from Cablevision, but following Schuberg's instructions, Plaintiff used a home Internet tool to provide his current I.P. address to Schuberg.  (*Id.* ¶ 41.)  He was not able to provide an I.P. address for the dates in which the relevant emails were sent, and the I.P. address he provided did not match the one used to send the relevant emails.  (*Id.*)

Cubbon followed up with IDT about their findings, and they confirmed that they were highly confident Plaintiff was the sender of the emails because they were sent from the same I.P. address that Plaintiff used to sign into Pernod's VPN on May 13, 2013 and May 21, 2013.  (*Id.* ¶¶ 35, 44; Sheridan Aff., Ex. 34 at 6030.)  The following Monday, June 3, Cubbon emailed Cargill and stated that she "expect[ed] to recommend termination" in light of IDT's findings.  (*Id*. ¶ 45; Sheridan Aff., Ex. 39at 6237.)

On June 3, 2013, Cubbon received IDT's final report, which concluded that Plaintiff had accessed Pernod's VPN with the I.P. address in question for an extended period of time.  (Kozak Aff., Ex. GG at 7115.)  As a result of the findings, Plaintiff was terminated for violating Pernod's policies against harassment and for impersonating Ambani in the communications sent to Fry

and Crane.  (Def.'s 56.1 ¶ 52.)  There is some dispute about who made the termination decision –
Fry, Cargill, or both.  (Pl.'s 56.1 ¶ 52.)  Schuberg called Plaintiff later in the day on June 3 to
communicate the termination decision and purportedly told Plaintiff he could apply for
unemployment benefits and that "there shouldn't be a problem receiving them."  (*Id.* ¶¶ 52-54.)

Plaintiff requested severance pay, but was denied because his termination was based on
misconduct and violations of company policy.  (*Id.* ¶ 53.)  Plaintiff also applied for
unemployment benefits.  After Plaintiff filed his application, the New York Department of Labor
("NYDOL") sent Pernod a questionnaire to complete.  (*Id.* ¶ 55.)  Shortly before receiving the
questionnaire, Plaintiff's counsel notified Pernod in writing that it opposed Pernod's termination
decision, which purportedly violated Plaintiff's protected status.  (*Id.*)  Pernod submitted its
response to the NYDOL questionnaire, characterizing Plaintiff's termination as a "Misconduct
Discharge."  (*Id.* ¶ 56.)  Although Schuberg later spoke with the NYDOL about Plaintiff's
termination, Pernod did not provide the department with the additional documentation it
requested.  (*Id.* ¶ 57-58.)  The NYDOL subsequently determined that Plaintiff would receive
unemployment benefits based in part on Pernod's failure to substantiate the termination, which
led the NYDOL to accept Plaintiff's denial of wrongdoing.  (*Id.* ¶ 58; Sheridan Aff., Ex. 51.)

## II.    Reorganization of Pernod's Marketing Department

Beginning in early 2013, Pernod planned to implement organizational changes in its
marketing department, known as "Marketing 2.0."  (*Id.* ¶ 59.)  The reorganization was scheduled
to occur in the beginning of June 2013.  (*Id.*)

Plaintiff was deemed qualified to be retained in the new organizational structure and was
slated to be promoted from Marketing Director for Tequila Avion to the newly created role of

Brand Director for all of Pernod's tequila brands.  (*Id.* ¶¶ 65-66.)[1]  The position would have

increased Plaintiff's responsibilities and his salary.  (*Id.* ¶ 67.)  Plaintiff was purportedly never

told of this promotion.  (*Id.* ¶¶ 66-67.)

    As of May 31, 2013, the Friday prior to Plaintiff's termination on Monday, June 3, 2013,

Plaintiff was still included in Pernod's organizational charts as the new Brand Director for

Tequila.  (Affirmation of Tarek M. Maheran, Esq., in Support of Pernod Ricard USA, LLC's

Motion for Summary Judgment ("Maheran Aff."), Ex. A at 6105.)  Plaintiff was not included

among the 11 individuals slated to be terminated as part of the restructuring.  (Sheridan Aff.,

Exs. 52-53; Kozak Aff., Exs. LL-OO.)

## III.    Subsequent Subpoena of Cablevision's Records

    After initiating this action, Defendant subpoenaed records from Cablevision, Plaintiff's

Internet service provider, related to the I.P. address from which the subject emails were sent –

67.87.228.31.  (Pl.'s 56.1 ¶ 74.)  In response, Cablevision confirmed that the relevant I.P. address

was assigned to Plaintiff's residence from at least April 1, 2013 through May 31, 2013, including

the dates on which each of the subject emails were sent.  (*Id.* ¶ 75.)

### STANDARD ON A MOTION FOR SUMMARY JUDGMENT

    Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving

party bears the initial burden of pointing to evidence in the record, "including depositions,

documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s]

the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

---

[1] Plaintiff does not genuinely dispute that he was slated to be promoted, but instead merely asserts that he was never told of the promotion.

8

(1986).  The moving party may also support an assertion that there is no genuine dispute by

"showing . . . that [the] adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to

the non-moving party to identify "specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks

omitted).  A genuine dispute of material fact exists when "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Id.* at 248; *accord Benn v. Kissane*, 510 F.

App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "constru[e] the evidence in the light

most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor."

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal

quotation marks omitted).  In reviewing the record, "the judge's function is not himself to weigh

the evidence and determine the truth of the matter," nor is it to determine a witness's credibility.

*Anderson*, 477 U.S. at 249.  Rather, "[t]he inquiry performed is the threshold inquiry of

determining whether there is the need for a trial."  *Id.* at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  The party asserting that a fact is

genuinely disputed must support their assertion by "citing to particular parts of materials in the

record" or "showing that the materials cited do not establish the absence . . . of a genuine

dispute."  Fed. R. Civ. P. 56(c)(1).  "Statements that are devoid of any specifics, but replete with

conclusions, are insufficient to defeat a properly supported motion for summary judgment."

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).  The nonmoving party "may not

rely on conclusory allegations or unsubstantiated speculation."  *FDIC v. Great Am. Ins. Co.*, 607

9

F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted).  Moreover, "[a non-moving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment."  *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) aff'd, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

### I.      State and Federal Employment Discrimination Claims

Plaintiff's claims for race, color, and/or national origin discrimination under Title VII or the NYSHRL are analyzed under the *McDonnell-Douglas* burden-shifting framework.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  *See also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  To establish a *prima facie* case of discrimination, a plaintiff must establish that: (1) he belongs to a protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's termination.  *Id.*  If the defendant proffers a non-discriminatory reason for the termination, the presumption falls away, and summary judgment for the defendant is appropriate "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (internal citations omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered

[nondiscriminatory] rationale is pretext, summary judgment dismissing the claim is appropriate."
*Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (internal citations and
quotation marks omitted).

### A.  *Prima Facie Case*

Defendant does dispute that Plaintiff has satisfied the first three elements of the
*McDonnell-Douglas* test.  Nevertheless, Defendant contends that there is no evidence in the
record giving rise to an inference of discrimination.  In response, Plaintiff offers four grounds
purportedly giving rise to an inference of discrimination: (1) the alleged misconduct was a
pretext for unlawful discrimination because a Caucasian employee was not terminated for similar
misconduct; (2) three Caucasian employees were terminated for poor performance one day after
Plaintiff was terminated and all three received severance, but Plaintiff did not; (3) Plaintiff was
not hired into a marketing position over a five-year period despite being qualified for the
positions; and (4) Defendant ultimately replaced Plaintiff after his termination with a Caucasian
who lacked the requisite marketing experience.  (Pl.'s Opp. at 2; Def.'s Mot. at 12-13.)

First, Plaintiff attempts to draw a comparison between his conduct and subsequent
termination, and the conduct and discipline of a Caucasian employee at Pernod.  "[A] showing
that the employer treated plaintiff less favorably than a similarly situated employee outside his
protected group . . . is a recognized method of raising an inference of discrimination for purposes
of making out a *prima facie* case."  *Humphreys v. Cablevision Sys. Corp.*, 553 F. App'x 13, 14-
15 (2d Cir. 2014) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003))
(internal quotation marks omitted).  Plaintiff must demonstrate, however, that he was similarly
situated in all material respects with the proposed comparator.  *Id.* at 15.

11

Here, Plaintiff compares himself to an employee who made insubordinate comments about his supervisor in a single instant message conversation with a colleague.  (Kozak Aff., Ex. SS.)  As a result of his comments, the employee was given a formal written warning, removed from his current role, and was to be reassigned to a new team.  (*Id.*)  Plaintiff's purported actions, however, are not similar in all material respects.  Aside from both Plaintiff and the proposed comparator using a computer to commit their misconduct, the proposed comparator did not: (1) use racist language; (2) send multiple anonymous emails harassing another employee; or (3) impersonate an employee in email communications to senior executives.  "When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment."  *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006) (collecting cases).  Plaintiff's conduct – directly harassing another employee by using racist and derogatory language, and impersonating him in emails to senior executives – was far more egregious than the fairly typical job-related complaining and insubordination in which the proposed comparator engaged.  Accordingly, Plaintiff has not proffered evidence of a similarly situated comparator.

Second, Plaintiff alleges that three Caucasian employees were terminated for poor performance one day after him and received severance, while Plaintiff did not, despite being eligible based on the elimination of his position as Marketing Director of Tequila Avion.  (Pl.'s Opp. at 2.)  Despite Plaintiff's arguments to the contrary, Plaintiff was not terminated because of the elimination of his position.  It is clear that Plaintiff was slated to be retained in the new marketing department and promoted to the newly created role of Brand Director for all of Pernod's tequila brands.  (Pl.'s 56.1 ¶¶ 65-66.)  As of May 31, 2013, the Friday prior to Plaintiff's termination, Plaintiff was still included in Pernod's organizational charts as the new

12

Brand Director for Tequila.  (Maheran Aff., Ex. A at 6105.)  Plaintiff was not included among the 11 individuals to be terminated as part of the restructuring.  (Sheridan Aff., Exs. 52-53; Kozak Aff., Exs. LL-OO.)  Plaintiff was terminated for misconduct and violation of Pernod's internal policies, which left him ineligible for severance under Pernod's severance policy. (Kozak Aff., Ex. H.)

In any event, the three terminated employees are not comparators to Plaintiff.  Defendant does not dispute that it considered the job performance of employees as part of the decision-making process for reorganizing the marketing department.  (Def.'s Reply at 3-4.)  Plaintiff himself was reviewed and deemed qualified to remain in the new organizational structure.  (Pl.'s 56.1 ¶ 65.)  After determining that these employees were not fit to remain in the new marketing department, Defendant decided that their terminations constituted job eliminations and offered them severance packages as provided for in Pernod's severance policy.  (*See* Kozak Aff., Ex. H ("The determination as to whether a job has been eliminated or relocated rests solely with the Company."), Ex. OO; Sheridan Aff., Ex. 52 (listing 11 individuals being terminated "as a result of the restructure"), Ex. 53 (termination "scripts" for the 11 employees, explaining that Pernod was "making changes to [its] Marketing strategy and structure" and noting for at least seven individuals that they would be terminating them after determining that they were "not demonstrating the required levels" for their positions.))  There is absolutely no evidence in the record to support the inference that Plaintiff was terminated as part of the reorganization, rather than as a result of his misconduct.  Thus, the three individuals proposed as comparators cannot be used to establish a *prima facie* case of discrimination.

Last, the fact that Plaintiff was not hired for a marketing director position earlier despite being purportedly qualified does not provide an inference of discrimination.  Defendant does not

dispute that Plaintiff applied for marketing director positions on a number of occasions, but contends that Plaintiff did not have the required spirits marketing experience. Each of the individuals hired had the requisite experience. (Def.'s Mot. at 14 n.11.) Plaintiff did, however, ultimately obtain a marketing position, as the brand manager for one of Pernod's tequila brands. Notably, Plaintiff did not complain of discrimination in the hiring process until the filing of the instant action and he has not proffered any evidence other than his own self-serving testimony that he was not hired for a director position because of his race, color, or national origin. Nor has Plaintiff proffered any evidence linking any prior hiring decision to the decision to terminate him in June 2013, the only adverse employment action at issue in this case. At best, Plaintiff has offered evidence that his replacement, following his termination, was Caucasian and had no prior spirits marketing experience. (Pl.'s 56.1 ¶ 3.) In support of this contention, Plaintiff proffers the LinkedIn profile of his replacement, which lists only details concerning his current employment at Pernod, as well as "Previous" associations with "The Seurat Group, General Mills, [and the] United States Air Force." (Sheridan Aff., at Ex. 10.) There is absolutely no basis on this limited evidence to conclude that his replacement had no spirits marketing experience, that the marketing department did not require such experience when Plaintiff previously applied for those positions, and that Plaintiff was fired in order to hire a Caucasian to fill the newly created position for which he was slated.

Plaintiff's failure to proffer any evidence sufficient to give rise to an inference of discrimination requires dismissal of his Title VII and NYSHRL claims.

### B.  Legitimate, Nondiscriminatory Reasons for Termination

Even assuming, *arguendo*, that Plaintiff established a *prima facie* case of discrimination, Defendant has proffered legitimate, nondiscriminatory reasons for Plaintiff's termination. "An

employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *DeLuca v. Allied Domecq Quick Serv. Rests.*, No. 03 Cv. 5142 (JFB) (AKT), 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006) (internal citation and quotation marks omitted).  Nevertheless, "an employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext.  Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective [belief], no inference of discrimination can be drawn." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 200) (internal citations and quotation marks omitted).

Here, the record is replete with evidence that Plaintiff was terminated following an investigation by a third-party I.T. specialist into anonymous and falsified emails sent to Pernod employees that violated the company's internal policies, including emails that were racially offensive, derogatory, and harassing.  (*See* Kozak Aff., Exs. A, I, J, Z, and GG.)  The I.T. specialist ultimately concluded that it was highly confident Plaintiff was responsible for sending the emails, as its investigation found that four of the five emails under review were sent from Plaintiff's home I.P. address.  Accordingly, Plaintiff's violation of Pernod's internal policies constitutes a legitimate, nondiscriminatory basis for Plaintiff's termination.  *See generally Pacenza v. IBM Corp.*, No. 04 Cv. 5831 (PGG), 2009 WL 890060 (S.D.N.Y. Apr. 2, 2009) *aff'd*, 363 F. App'x 128 (2d Cir. 2010).

### C. Pretext

Because Defendant has met its burden of production by offering evidence that Plaintiff was terminated as a result of Defendant's investigation into the subject emails, the burden shifts back to Plaintiff to "show that the proffered reason was merely a pretext for discrimination,

which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal citation and quotation marks omitted). "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (internal citation and quotation marks omitted).

Plaintiff offers myriad arguments in support of his contention that Defendant's reasons for his termination are merely a pretext. Plaintiff argues, *inter alia*, that he: was not working with Ambani at the time the two emails were sent to senior executives, and therefore was not privy to the subject matter of the emails; did not have any interest in taking Ambani's job; did not speak Hindi and was not familiar with the purportedly racist and/or derogatory terms contained in the three emails sent to Ambani; and was never disciplined, exceeded performance expectations, and was, according to Pernod, slated for a promotion. (*See* Pl.'s Opp. at 16-19.) Plaintiff also argues that the I.T. specialist was hired at the behest of Defendant's counsel, which the Court assumes is meant to imply some sort of nefarious motive on the part of counsel, and that Cubbon determined what was deemed racially discriminatory in the emails Ambani received, despite not knowing whether the terms were actually racist or derogatory. (*Id.*)

Even accepting all of Plaintiff's arguments of pretext as true, Plaintiff has, at best, proffered evidence that Pernod's investigation was poorly managed and its findings were illogical. Plaintiff has not, however, pointed to any evidence suggesting that Defendant's beliefs

concerning the results of the investigation and the nature of the relevant emails were anything but honestly held.  The I.P. address from which the emails were sent matched the Plaintiff's home I.P. address.  Even assuming that the I.T. specialist incorrectly matched the I.P. addresses, Cablevision's own records subpoenaed as part of this action confirmed the match.  Whether or not Defendant's decision to terminate Plaintiff was based on erroneous facts – including, for instance, a misunderstanding of the purportedly racist or derogatory terms contained in the emails – is of no consequence, as such a decision is not unlawful absent some prohibited factor motivating Defendant's decision to terminate Plaintiff.

Plaintiff has simply failed to proffer any evidence of a discriminatory reason for Defendant's actions, with the exception of his own self-serving statements and testimony. Plaintiff's contentions are belied by the facts in this case.  Defendant first sought to investigate Ambani as the source of the emails to senior executives, as he appeared to be their author.  The company was not even aware of the three purportedly racist and harassing emails until after Ambani spoke with Nicodemo about the emails sent to senior executives.  Moreover, at that time and up until Plaintiff was terminated, Plaintiff was slated for a promotion.  To conclude that the investigation was a pretext, this Court would need to believe a wildly unrealistic story, something to the effect of the following: someone at Pernod drafted fictitious emails to senior executives, purportedly from an Indian-American employee, while somehow using Plaintiff's home I.P. address, in order to initiate a costly internal investigation by a third-party I.T. specialist for the purpose of terminating Plaintiff, another Indian-American employee, because of his race, color, or national origin, in order to avoid paying Plaintiff severance upon his termination as part of a larger marketing department reorganization.

17

Absent any evidence demonstrating or even providing an inference of pretext, the Court finds that Plaintiff's Title VII and NYSHRL claims fail as a matter of law.

## II.       State and Federal Retaliation Claims

Plaintiff's claim for retaliation in violation of Title VII or the NYSHRL is also analyzed under the *McDonnell-Douglas* burden-shifting framework.  To establish a *prima facie* case of retaliation, a plaintiff must show: "1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (internal citation and quotation marks omitted).  After establishing a *prima facie* case, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action."  *Id.* at 845 (internal citation omitted).  If the defendant meets this burden, the presumption falls away and the plaintiff must offer evidence demonstrating that the non-retaliatory reason is merely a pretext for retaliation. *Id.*  The Supreme Court has also required the plaintiff show that the "retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Id.* (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 (2013)).  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 846.

Plaintiff's retaliation claim is based on Defendant's opposition to his application for unemployment insurance benefits, which occurred after Defendant received a letter from Plaintiff's attorney contending that Plaintiff was unlawfully discharged based on his race. (Sheridan Aff., Ex. 48.)  Plaintiff contends that at the time of his termination, Schuberg told Plaintiff that Pernod "would not contest his right to receive such benefits."  (Compl. ¶ 22.)

Defendant does not dispute that Plaintiff has satisfied the first two elements of the *McDonnell-Douglas* test, but argues that Plaintiff has not suffered an adverse action in connection with his application for unemployment benefits, and that Plaintiff cannot demonstrate a causal connection between the receipt of Plaintiff's attorney's letter and the opposition to his application for unemployment benefits.

### A. Adverse Employment Action

Courts in this District have held that mere opposition to a former employee's application for unemployment insurance benefits, particularly when the employee ultimately receives benefits, does not rise to the level of an adverse employment action. *See, e.g, Barriera v. Bankers Trust*, No. 98 Cv. 3641 (MBM), 2003 WL 22387099, at *8 (S.D.N.Y. Oct. 20, 2003); *Whalley v. Reliance Grp. Holdings, Inc.*, No. 97 Cv. 4018 (VM), 2001 WL 55726, at *12 (S.D.N.Y. Jan. 22, 2001); *Harewood v. Beth Israel Med. Ctr.*, No. 02 Cv. 5511 (HB), 2003 WL 21373279, at *4 (S.D.N.Y. June 13, 2003). Nevertheless, other "courts in this Circuit [and District] . . . have found that an employer's opposition to unemployment insurance benefits may qualify as an adverse action." *Holleman v. Art Crating Inc.*, No. 12 Cv. 2719 (VMS), 2014 WL 4907732, at *48 (E.D.N.Y. Sept. 30, 2014) (collecting cases). In *Holleman*, the court found that decisions in the Circuit "comport[ed] with [*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)], which advised applying a 'broad' interpretation to Title VII's antiretaliation provision, provided that the conduct in question involved a material harm." *Holleman*, 2014 WL 4907732 at *49. In applying such an interpretation, the Supreme Court noted that "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern*, 548 U.S. at 69. In *Burlington Northern*, the Supreme Court held that a 37-day suspension without pay demonstrated material adversity, *id.* at 71-73; in

19

*Holleman*, the court held that the suspension of unemployment insurance benefits for "many weeks" demonstrated an adverse action. *Holleman*, 2014 WL 4907732 at *49. The Court therefore turns to the specific facts and circumstances of this case to determine whether an adverse action is present.

As an initial matter, Plaintiff was never told that Pernod would not oppose his application for benefits. Plaintiff testified that he was told by Schuberg that he "should apply for unemployment and there shouldn't be any problems." (Kozak Aff., Ex. AA at 225:3-5; *see also* Pl.'s 56.1 ¶ 54.) Although Plaintiff has construed this as a promise not to oppose his application for benefits, Plaintiff has not pointed to any evidence in the record supporting such an understanding of this purported comment, with the exception of his own self-serving statements. The only other relevant evidence on the subject is contradictory – Schuberg testified that he did not discuss with Plaintiff whether Pernod would oppose his application for benefits, and, "as a matter of practice," he does not discuss whether Pernod will oppose unemployment benefits applications when terminating an employee. (Kozak Aff., Ex. S at 218:4-10.)

In any event, even if Defendant had stated its intention not to oppose Plaintiff's application for benefits, Plaintiff ultimately received those benefits after a short delay. Plaintiff applied for benefits on or about June 16, 2013. (Compl. ¶ 23.) Plaintiff's "Claim Effective / Start Date" listed on the NYDOL unemployment insurance questionnaire sent to Pernod was June 17, 2013. (Sheridan Aff., Ex. 49.) Plaintiff's attorney wrote to Pernod concerning Plaintiff's termination on June 21, 2013. (*Id.*, Ex. 48.) The NYDOL unemployment insurance questionnaire was mailed to Pernod on June 24, 2013, and Pernod responded on or about July 2, 2013. (*Id.*, Ex. 49.) On or about July 8, 2013, Plaintiff was informed that Pernod was opposing his application for benefits. (Compl. ¶ 26.) Pernod spoke with the NYDOL by phone on July 9,

2013, but did not provide any of the documentation additionally requested by the department. (Sheridan Aff., Ex. 50; Pl.'s 56.1 ¶¶ 57-58.)  Plaintiff was deemed eligible for unemployment benefits on July 12, 2013.  (Sheridan Aff., Ex. 51.)  Although Plaintiff contends that he "was without benefits for nearly a month due to [Defendant's] challenge on his right to benefits," (Pl.'s Opp. at 20), it is clear from the timeline above that Plaintiff was delayed no more than ten days in receiving benefits – from the day on which Defendant completed the NYDOL's questionnaire, July 2, 2013, until the NYDOL determined that Plaintiff was eligible for benefits on July 12, 2013.  Defendant's response to the NYDOL's request was timely[2] and Plaintiff has not provided any evidence that this short delay in receiving benefits "was more disruptive than a mere inconvenience," *Barriera*, 2003 WL 22387099 at *8 (internal citation omitted), other than to incorrectly assert that he was without benefits for nearly a month as a result of Defendant's alleged retaliatory actions.

Accordingly, the Court finds that Plaintiff's delay of no more than ten days in receiving unemployment benefits is not sufficient to demonstrate a materially adverse action.

### B.  Causation

Even if Plaintiff had demonstrated a materially adverse action sufficient to satisfy the third element of its *prima facie* case, Plaintiff cannot establish a causal link between his protected activity and Defendant's alleged retaliatory response.  Plaintiff appears to assert two bases for causation: (1) that Schuberg informed him that Defendant would not oppose his application for unemployment benefits; and (2) the temporal proximity between Plaintiff's

---

[2] To the extent that an employer is opposing an application for benefits, it is required to respond to the NYDOL's "notice of potential charges . . . within 10 calendar days of the date on the claim notice." 12 N.Y.C.R.R. § 472.12(a).  The claim notice was dated June 24, 2013.  Pernod responded on or about July 2, 2013, eight calendar days later.

attorney's letter asserting claims of racial discrimination and Defendant's opposition to his application. (Pl.'s Opp. at 21.)

First, as previously discussed, by Plaintiff's own admission he was never explicitly told that Pernod would not oppose his application for benefits, and he has offered no evidence in support of this contention except for his own self-serving statements. The Court is therefore unable to draw any causal link between the purported statement and the alleged retaliatory action.

Second, Plaintiff has not offered sufficient evidence to support his temporal proximity theory of causation. In *Holleman*, a case on which Plaintiff relies in support of his retaliation claim, (Pl.'s Opp. at 20), the court recognized that a defendant's opposition to a plaintiff's claim for unemployment insurance benefits, made after the plaintiff filed a discrimination complaint, was insufficient to establish a causal link without additional supporting evidence. *Holleman*, 2014 WL 4907732 at *50. Here, like *Holleman*, Plaintiff has failed to "identify any statements Defendant[] made to the NYDOL that were untrue or that otherwise evidence retaliation, nor does []he identify any statements made to [him] that would indicate retaliatory animus, such as a threat to oppose [his] benefits if []he filed a lawsuit." *Id.* Instead, Plaintiff relies solely on the short period of time between his attorney's letter and the opposition to his application for benefits, coupled with Defendant's purported promise not to oppose his application, to prove a causal connection. In other words, Plaintiff relies solely on his own subjective beliefs concerning Plaintiff's statements and actions. Without more, Plaintiff cannot satisfy the fourth element of his *prima facie* case, and his retaliation claim under Title VII or the NYSHRL fails.[3]

---

[3] Although the Court need not reach the question of whether the alleged retaliation was the "but-for" cause of the purportedly adverse employment action, Plaintiff essentially concedes that Defendant would have responded to the NYDOL's inquiries regardless of whether Plaintiff's attorney sent a letter alleging unlawful discrimination. (*See* Pl.'s Opp. at 21) ("While it is clear that Mr. Schuberg would have responded to the NYSDOL inquiry 'but for'

### III.    NYCHRL Claims

Plaintiff's claims of discrimination and retaliation under the NYCHRL are analyzed

separately from Plaintiff's Title VII and NYSHRL claims.  *Mihalik v. Credit Agricole Cheuvreux*

*N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  Under the NYCHRL, to succeed on his

discrimination claim:

> [P]laintiff need only show that [his] employer treated [him] less well, at least in part for
> a discriminatory reason. The employer may present evidence of its legitimate, non-
> discriminatory motives to show the conduct was not caused by discrimination, but it is
> entitled to summary judgment on this basis only if the record establishes as a matter of
> law that discrimination play[ed] *no* role in its actions.

*Id*. at 110 n.8 (internal citations and quotation marks omitted).  With respect to Plaintiff's

retaliation claim, Plaintiff "must show that []he took an action opposing [his] employer's

discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely

to deter a person from engaging in such action."  *Id.* at 112 (internal citations omitted).  Even

under these broader standards, Plaintiff's discrimination and retaliation claims still fail.

The record in this case is simply devoid of any evidence that Plaintiff's termination

without severance was the result of, or in any way motivated by, Plaintiff's race, color, or

national origin, rather than the results of Defendant's investigation into the five subject emails.

*See* Point I, *supra.*  The only evidence to which Plaintiff points alleging such hostility stems from

his own subjective, conclusory, and self-serving statements concerning his failure to be hired

into a marketing director position and his perceived difference in treatment to comparators with

whom he was not similarly situated.  Absent any evidence of discrimination, summary judgment

is appropriate on Plaintiff's NYCHRL discrimination claim.  *See Mathew v. N. Shore-Long*

*Island Jewish Health Sys., Inc.*, 582 F. App'x 70, 71 (2d Cir. 2014) (summary order) (dismissing

---

Plaintiff's protected activity . . . .")  Plaintiff's concession defeats his retaliation claim and provides an alternative
basis for dismissal.  *See Kwan*, 737 F.3d at 845.

NYCHRL claim after plaintiff failed to proffer any evidence that he was terminated for any reason other than his misconduct).

Likewise, Plaintiff fails to demonstrate that Defendant's opposition to his application for unemployment insurance benefits resulted from his attorney sending a letter to Defendant contesting his termination.  In fact, Plaintiff concedes that Defendant would have replied to the NYDOL's questionnaire whether or not Plaintiff's attorney sent a letter alleging discrimination. (*See* Pl.'s Opp. at 21) ("While it is clear that Mr. Schuberg would have responded to the NYSDOL inquiry 'but for' Plaintiff's protected activity . . . .")  Even without Plaintiff's presumably inadvertent concession, the record is yet again devoid of any evidence that Defendant opposed Plaintiff's application for benefits because of his attorney's letter.  *See* Point II, *supra.*

Finally, Plaintiff's reliance on *Electchester Hous. Project, Inc. v. Rosa*, 225 A.D.2d 772, 773 (2nd Dep't 1996) is misplaced and distinguishable from this case.  In *Electchester*, the Second Department held that the plaintiff established a claim of retaliation under the NYCHRL after her employer "assur[ed] [her] that she would be entitled to [unemployment insurance] benefits," but then opposed her application "solely because she filed a complaint with the [State Division of Human Rights]."  *Id.*  Defendant made no such assurances in this case, stating, at most, that Plaintiff "should apply for unemployment and there shouldn't be any problems." (Def.'s 56.1, Ex. AA at 225:3-5; Pl.'s 56.1 ¶ 54.)  Absent any evidence that such assurances were made, Plaintiff's NYCHRL claim for retaliation also fails.

## IV.   ERISA Claim

Plaintiff's final claim for relief alleges that Defendant violated his rights under ERISA by failing to pay him severance under Defendant's severance policy following his termination. Plaintiff's denial of benefits is reviewed *de novo*, "unless the benefit plan gives the administrator

or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms

of the plan." *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 738 (2d Cir.

2001) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (internal

quotation marks omitted).  In such cases, courts "will not disturb the administrator's ultimate

conclusion unless it is arbitrary and capricious, that is, if that determination is without reason,

unsupported by substantial evidence or erroneous as a matter of law." *Kirk v. Schindler Elevator

Corp.*, No. 03 Cv. 8688 (SHS), 2004 WL 1933584, at *3 (S.D.N.Y. Aug. 31, 2004) (citing

*Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)) (internal citations and

quotation marks omitted).  "The language of the relevant provisions of the [severance policy]

determines whether [Plaintiff] is entitled to severance benefits." *Id.* at *3 (citing *Donnelly v.

Bank of New York Company, Inc.*, 801 F.Supp. 1247, 1252 (S.D.N.Y. 1992); *see also Kosakow*,

274 F.3d at 737-39 (2d Cir. 2001); *Reeves v. Continental Equities Corp. of Am.*, 912 F.2d 37, 43

(2d Cir. 1990)).

        Although Plaintiff argues that three employees received severance benefits despite being

fired for reasons that were not eligible for severance under the policy, Plaintiff's main contention

appears to be that he was entitled to severance based on the elimination of his position.  (Pl.'s

Opp. at 23-24.)  Defendant's severance policy provides for the payment of severance "due to job

elimination," but "[t]he determination as to whether a job has been eliminated . . . rests solely

with the [Defendant]."  (Kozak Aff., Ex. H.)  "Job Elimination" is defined in the severance

policy as follows: "For purposes of this policy, a job is eliminated if the position is removed

from the department in which an employee works or if the position is altered such that 50% or

more of the job description has changed." *Id.*  Plaintiff contends that his role as "Brand Director

Tequila, for which [he] was allegedly slated, was changed more than 50% following [his]

termination of employment." (Pl.'s Opp. at 24.)  Under either an abuse of discretion standard, to which Defendant appears entitled, or *de novo* review, Plaintiff's claim fails as a matter of law.

Plaintiff concedes that the three employees terminated for poor performance were "marked for termination as part of Marketing 2.0" – Defendant's reorganization of its marketing department. (Pl.'s Opp. at 23.)  As previously discussed, Defendant does not dispute that it considered the job performance of employees as part of the decision-making process for reorganizing the marketing department. (Def.'s Reply at 3-4.)  Nevertheless, Defendant's severance policy permits it to determine whether an employee's job has been eliminated.  In accordance with that authority, Defendant decided that the terminations resulting from its marketing department reorganization would be classified as job eliminations and offered severance packages as provided for in its severance policy.  (Kozak Aff., Ex. OO; Sheridan Aff., Ex. 52 (listing 11 individuals being terminated "as a result of the restructure"), Ex. 53 (termination "scripts" for the 11 employees, explaining that Pernod was "making changes to [its] Marketing strategy and structure."))

In any event, Plaintiff's claim for severance rests on the purported elimination of his position and/or the fact that his new position would have altered his duties by more than 50 percent.  Again, as previously discussed, Plaintiff's termination was not the result of job elimination.  The record makes clear that Plaintiff was to be retained in the new marketing department and promoted to the newly created role of Brand Director for all of Pernod's tequila brands. (Pl.'s 56.1 ¶¶ 65-66.)  Plaintiff was unquestionably not included among the 11 individuals to be terminated as part of the restructuring.  (Sheridan Aff., Exs. 52-53; Kozak Aff., Exs. LL-OO.)  Plaintiff was terminated following Defendant's internal investigation for

misconduct and violation of its internal policies, which left him ineligible for severance under Defendant's severance policy.  His ERISA claim therefore fails.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 29, enter judgment in favor of Defendant, and close this case.

Dated:    August 13, 2015                                 SO ORDERED:
          White Plains, New York

                                                          _____
                                                          NELSON S. ROMÁN
                                                          United States District Judge